**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Daryl J. BOICH, Appellee.**

Superior Court of Pennsylvania.

Argued March 12, 2008.
Filed Oct. 6, 2009.

---

Frank P. Barletta, Assistant District Attorney, Wilkes–Barre, for Commonwealth, appellant.

Albert J. Flora, Forty Fort, for appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, ORIE MELVIN, LALLY–GREEN *, KLEIN, BENDER, BOWES, GANTMAN, and SHOGAN, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Luzerne County Court of Common Pleas, which granted the pre-trial motion of rape defendant Appellee, Daryl J. Boich, to direct the adult rape complainant ("C.U.") to submit to an involuntary psychiatric examination for purposes of deciding her competency to testify at trial. The Commonwealth asks whether the court erred when it found compelling reasons to grant Appellee's request. We hold the court erred when it ordered an involuntary psychiatric examination of C.U. on the grounds alleged. Accordingly, we reverse and remand for further proceedings.

¶ 2 The testimony of C.U. at Appellee's preliminary hearing revealed that on October 13, 2005, at approximately 10:00 p.m., C.U. and three friends went to a bar in Wilkes–Barre, Pennsylvania. At the bar, C.U. saw a co-worker who knew Appellee.

---

* Judge Lally–Green did not participate in the consideration or decision of this case.

They greeted Appellee, while they and others were all crowded in front of the stage where a band was preparing to perform. As the evening wore on past midnight, C.U., Appellee, and others drank, danced, and casually conversed mostly in a group setting. Upon repeated questions as to the content of her conversations with Appellee, C.U. could not recall the gist of those conversations because the bar was crowded and loud. C.U. maintained the conversations were all casual and inconsequential. At one point, C.U. accepted a dare from her co-worker to kiss another female dancer C.U. did not know. C.U. agreed and did so, but on the rebuttal dare that the co-worker would kiss Appellee, which he also did. C.U. testified that the kiss was just a prank.

¶ 3 Later, when C.U. decided she wanted to go home, she could not readily locate the friends she had arrived with, so she accepted a ride home from Appellee. On the way out of the bar, C.U. encountered her co-worker, who also offered C.U. a ride home, but not until later. As C.U. wanted to leave at that moment, she told her co-worker she was going to leave with Appellee. Appellee preceded C.U. out of the bar and into the parking lot, where he cleared off the front passenger seat of his car for C.U. C.U. admitted she was attracted to Appellee and hoped to exchange phone numbers with him.

¶ 4 Once inside Appellee's Mercedes, C.U. and Appellee began to kiss. C.U. soon became uncomfortable, because Appellee was "getting a little pushy" by grabbing C.U.'s breasts. At that point, C.U. told Appellee she just wanted to go home. Appellee agreed. Appellee instead drove to the back parking lot of the bar, stopped his vehicle, grabbed C.U.'s hair, pulled her head down into his lap, and forced C.U. to perform oral sex on him. When it became evident that C.U. would not participate. Appellee released her head. Appellee again purported to leave but instead drove the car to an even more secluded area behind the bar. Appellee and C.U. then moved outside the vehicle, where Appellee forcibly pulled down C.U.'s jeans and panties, pushed her onto the car, held her firmly, and forced her to have sexual intercourse with him on the hood of the car. C.U. told Appellee to stop, but he refused and ceased only when C.U.'s cell phone rang. C.U. advised Appellee that her friends would contact the police if she did not answer the phone, so Appellee released C.U. who was then able to push him off of her. C.U.'s phone was inside the car on the floor. C.U. answered it and had a short phone conversation. After C.U. terminated the call, Appellee told her to get out of the car, which she did. Appellee left C.U. and drove away from the area. While making her way back to the bar's main parking lot, she contacted her co-worker and told him what had happened. C.U. went to the hospital where a rape kit was performed. The incident was later reported to the police. (N.T. Preliminary Hearing, 12/12/05, at 7–121).

¶ 5 As a result of interviews with C.U. and others, the police charged Appellee with rape,[1] involuntary deviate sexual intercourse,[2] and two counts of sexual assault.[3] On December 12, 2005, the district magistrate conducted the preliminary hearing. Based solely on C.U.'s testimony, including rigorous cross-examination of C.U. by the defense, the magistrate ruled the Commonwealth had presented a *prima facie* case on the charges and bound the

---

1. 18 Pa.C.S.A. § 3121.

2. 18 Pa.C.S.A. § 3123.

3. 18 Pa.C.S.A. § 3124.1.

matter over to the Court of Common Pleas for trial.

¶ 6 Thereafter, Appellee filed a request for a bill of particulars on July 20, 2006, several discovery requests on July 20, 2006, August 8, 2006, and August 14, 2006, as well as an omnibus pre-trial motion for a competency hearing, an involuntary psychiatric or psychological examination of C.U. by a defense expert, and disclosure of C.U.'s medical, psychiatric and psychological treatment records on August 14, 2006.

¶ 7 In his omnibus pre-trial motion, Appellee averred C.U. had demonstrated at the preliminary hearing "an inability to remember specific facts about the alleged incident." (*See* Omnibus Pretrial Motion of Appellee, filed 8/14/06, at 2–4). Relying on the transcript from the preliminary hearing, Appellee specifically asserted (1) C.U. had responded "I don't recall" no less that thirty-five (35) times during questioning at the preliminary hearing; (2) she admitted she was intoxicated on the night of the alleged incident; (3) she admitted taking "a number of medications" on the day of the alleged incident; (4) she "demonstrated a substantial inability to either remember or accurately remember material facts regarding the occurrences during her direct and cross-examination"; and (5) C.U. "has a history of exaggerating intimate physical contacts with prior boyfriends resulting in false allegations of physical abuse, is hot tempered and appears emotionally unstable during periods of intimacy."[4] (*See id.*) On these grounds. Appellee concluded C.U. was not legally competent to testify at trial.

¶ 8 On October 3, 2006, Appellee filed a document called "Supplemental Reasons Supporting Need for Involuntary Psychiatric Examination of Complainant" in which Appellee repeated that C.U.'s "mental instability" at the time of the incident was admissible to impeach her credibility. Appellee further averred C.U/s admitted intoxication, use of narcotic drugs, inability to "remember material facts" and her "mental instability" affected her credibility. (*See* Appellee's Supplemental Reasons, filed 10/3/06, at 1). On these grounds, Appellee again requested, *inter alia,* the court to compel an involuntary psychiatric and/or psychological evaluation of C.U. by Appellee's defense expert. *Id.*

¶ 9 On October 5, 2006, the Court of Common Pleas trial court held a pretrial hearing. Appellee presented testimony of the defense forensic psychiatry expert, Richard Fischbein, M.D. Over the Commonwealth's objection, Dr. Fischbein was permitted to say he would want to perform a psychiatric interview of C.U. to find out why C.U. was on a prescription medication for stomach problems, when that medication is typically used to treat depression or an anxiety disorder. Dr. Fischbein said without an examination, he could not tell why C.U. failed to remember all the details of the incident of October 5, 2005, that an examination "would be helpful" in figuring out why C.U. had difficulty remembering the event. He also opined that the prescription medications C.U. admitted taking were not compatible with alcohol intake. In other words, a person on her medications should limit drinking alcoholic beverages. Dr. Fischbein also stated he suspected C.U. was also being treated for depression rather than just stomach problems, because the medication she took on the morning of October 5, 2005 was a "commitment" drug not usually prescribed for short term disorders. Dr. Fischbein

---

**4.** The certified record does not sustain in any manner whatsoever the fifth point concerning C.U.'s history and appears to be a wholly gratuitous and scurrilous allegation that was not ever developed or supported.

wanted to know why the medications had been prescribed. Coupled with significant other testing, Dr. Fischbein wanted to discover if C.U. had any "personality issues" consistent with post-traumatic stress disorder.

¶ 10 On cross-examination, Dr. Fischbein conceded that C.U. had remembered many details about the incident. He also agreed the details C.U. failed to remember were minor things, such as whether the beer she drank was draft or in a bottle. Although Dr. Fischbein insisted the issue for him was more than just intoxication, he also conceded the real issue was not necessarily why the prescription drugs had been prescribed but the effects of the interaction of the drugs and alcohol. Dr. Fischbein also conceded that after an evaluation, he might still not have an explanation for why C.U.'s memory was "impaired." (N.T. Pre-trial Hearing, 12/12/06, at 27–73). C.U. was also present at the hearing. Nevertheless, she was called to testify only with respect to (1) whether she had generated any emails about the incident, which she denied; and (2) whether she had ever been treated as an outpatient or inpatient at any psychiatric facility, which she also denied. (*Id.* at 75–76; R.R. Vol. II at 77a–78a). Neither the court nor defense counsel asked C.U. any other questions, although she was available for inquiry.

¶ 11 Following the hearing, the trial court granted Appellee's motion for medical records limited to the prescription drugs Lexapro and Darvocet. The court also granted the defense motion for an involuntary psychiatric and/or psychological examination of C.U. by Dr. Fischbein. In support of its decision to grant these requests, the court stated:

¶ 12 While none of the facts relied upon by [Appellee], in isolation, establish a com-

pelling need for an examination; considered together one is clearly warranted. **This [c]ourt simply lacks sufficient expertise to understand and evaluate the physical/psychiatric affects and effects of ingestion of these substances by the alleged victim.** This evaluation and determination becomes more difficult given the alleged victim's acknowledged alcohol consumption. Dr. Fischbein's testimony establishes the ingestion of a combination of these constituent substances implicates a person's ability to perceive and recall. **We cannot make a factual determination on the ultimate issue of testimonial competency unless we understand and appreciate the drugs' interaction and the extent to which they [a]ffected the ability to accurately recall, perceive and articulate the relevant sequence of events.**

(Trial Court Opinion, filed December 13, 2006, at 10) (emphasis added) (internal footnotes omitted). The court denied the defense request for C.U.'s past psychiatric and/or psychological treatment records as moot.

¶ 13 On October 10, 2006, the Commonwealth filed a motion for reconsideration, which the court denied on October 11, 2006. On October 19, 2006, the Commonwealth timely filed its notice of appeal and a second motion for reconsideration. On the same day, the court ordered the Commonwealth to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). The Commonwealth timely filed its Rule 1925(b) statement on November 2, 2006. In a rather unprecedented move, Appellee filed a "reply" to the Commonwealth's Rule 1925(b) statement on November 7, 2006.[5]

---

**5.** Nothing in the rule provides for a reply to a Rule 1925(b) statement. Nothing in the rec-

ord indicates Appellee filed the reply with leave of court.

¶ 14 On August 22, 2007, a panel of this Court affirmed, with one dissent. The Commonwealth subsequently requested *en banc* reargument. By *per curiam* order, on October 29, 2007, this Court granted reargument, withdrew its panel decision, directed the case to be listed before an *en banc* panel, and instructed the parties to re-file the brief previously filed together with a supplemental brief or prepare and file a substituted brief. Both parties filed substituted briefs.

¶ 15 On appeal, the Commonwealth raises the following issue for our review:

DID THE TRIAL COURT ERR IN GRANTING [APPELLEE'S] MOTION FOR THE INVOLUNTARY PSYCHOLOGICAL EXAMINATION OF THE VICTIM, WHERE NO COMPELLING NEED FOR SUCH AN EXAMINATION IS DEMONSTRATED IN THE RECORD?

(Commonwealth's Substituted Brief on Reargument at 4).

¶ 16 The Commonwealth argues in general court-ordered psychiatric examinations involve a high degree of intrusion that unnecessarily invades a victim's privacy rights. The Commonwealth asserts the defense failed to demonstrate a compelling reason or substantial need for an involuntary examination in this case. The Commonwealth maintains a compelling need exists only when the record unequivocally indicates a question of witness competency. The Commonwealth claims the trial court essentially merged the concepts of competency and credibility. The Commonwealth suggests C.U.'s inability to remember small or insignificant details about the evening in question does not warrant a compelled psychiatric evaluation, given legal precedent disfavoring such examinations, except under the most extreme circumstances. Any gaps in C.U.'s testimony present a credibility issue for the fact finder.

¶ 17 The Commonwealth also argues a compelled psychiatric evaluation of C.U., conducted months after the incident, would not resolve the question of C.U.'s ability to recall some of the details of the evening in question. The Commonwealth urges forced psychiatric examinations of adult sexual assault victims, on a record lacking compelling need, will further chill victims already reluctant to report sex crimes for fear of intrusive mental health evaluations. The Commonwealth concludes the record in this case does not support the trial court's order directing C.U. to submit to an involuntary psychiatric evaluation, and this Court should reverse the order and remand for trial to proceed.

¶ 18 In response, Appellee argues C.U. had "substantial" difficulty during the preliminary hearing recalling relevant matters relating to the alleged assault. Appellee maintains that on seventy-one (71) occasions during cross-examination, C.U. stated she either did not remember or did not recall a specific detail of the night in question. Appellee claims C.U.'s "selective, piecemeal description of events" raises a substantial and valid question of her "testimonial competency," which the trial court was obligated to resolve. Appellee insists these testimonial omissions, C.U.'s delay in reporting the alleged assault, and her admitted alcohol consumption prior to the alleged attack, create a heightened danger that C.U. lacks the capacity to accurately recall the facts. Appellee further argues the only way to determine the "cause for the blanks in complainant's memory" is through a compelled psychiatric and/or psychological evaluation. Thus, Appellee concludes the record established the need for an involuntary psychiatric and/or psychological evaluation of C.U., and this Court should affirm the trial court's order.

For the following reasons, we agree with the Commonwealth's position.

¶ 19 As a prefatory matter, the Commonwealth's appeal is proper under the collateral order doctrine. *See Commonwealth v. Shearer*, 584 Pa. 134, 882 A.2d 462 (2005) (holding Commonwealth's appeal of order requiring complainant to submit to psychiatric examination was proper under collateral order doctrine); *Commonwealth v. Alston*, 864 A.2d 539 (Pa.Super.2004) (*en banc*) (stating court's decision to require rape victim to undergo involuntary psychiatric examination is subject to review under collateral order doctrine). *See also Commonwealth v. Watson*, 597 Pa. 483, 952 A.2d 541 (2008) (reviewing as immediately appealable, under Pa.R.A.P. 313, order denying Commonwealth's request for involuntary administration of antipsychotic medication for purposes of rendering death-row inmate competent to participate in post-conviction proceedings).

■■■ ¶ 20 Generally, on review of an order granting or denying a discovery request, an appellate court applies an abuse of discretion standard. *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167 (1999). Likewise, evidentiary rulings are subject to an abuse of discretion standard. *Commonwealth v. Henkel*, 938 A.2d 433, 440 (Pa.Super.2007), *appeal denied*, 598 Pa. 755, 955 A.2d 356 (2008).

> Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as

shown by the evidence or the record, discretion is abused.

*Commonwealth v. Hunt*, 858 A.2d 1234, 1238 (Pa.Super.2004) (*en banc*), *appeal denied*, 583 Pa. 659, 875 A.2d 1073 (2005) (internal citations and quotation marks omitted).

■■■ ¶ 21 Pennsylvania Rule of Evidence 601 provides, in pertinent part:

**Rule 601. Competency**

(a) **General Rule.** Every person is competent to be a witness except as otherwise provided by statute or in these Rules.

(b) **Disqualification for Specific Defects.** A person is incompetent to testify if the Court finds that **because of a mental condition or immaturity** the person:

(1) is, or was, at any relevant time, incapable of perceiving accurately;

(2) is unable to express ... herself so as to be understood either directly or through an interpreter;

(3) has an impaired memory; or

(4) does not sufficiently understand the duty to tell the truth.

Pa.R.E. 601 (emphasis added). This rule is expressly intended to preserve existing Pennsylvania law. *Id., Comment.* "In general, the testimony of any person, regardless of [her] mental condition, is competent evidence, unless it contributes nothing at all because the victim is wholly untrustworthy. Thus, in Pennsylvania, [a witness is] presumed competent to testify, and it is incumbent upon the party challenging the testimony to establish incompetence." *Commonwealth v. Anderson*, 381 Pa.Super. 1, 552 A.2d 1064, 1067 (1988), *appeal denied*, 524 Pa. 616, 571 A.2d 379 (1989) (internal citations omitted).[6] Above all, given the general pre-

---

**6.** The presumption of competency also applies to child witnesses. *Id.* In the case of a

sumption of competency of all witnesses, a court ought not to order a competency investigation, unless the court has actually observed the witness testify and still has doubts about the witness' competency. *Id.*

¶ 22 Claims that a witness' memory has been corrupted by insanity, mental retardation, hypnosis, or taint go to the competency of that witness to testify. *Commonwealth v. Delbridge*, 578 Pa. 641, 643, 855 A.2d 27, 40 (2003) (*"Delbridge I"*). The capacity to remember and the ability to testify truthfully about the matter remembered are components of testimonial competency. *Delbridge II, supra.* The party alleging a witness is incompetent to testify must prove that contention by clear and convincing evidence. *Delbridge I, supra* at 663, 855 A.2d at 40.

¶ 23 When rendering a decision to disqualify a witness as incompetent, a court can rely on expert testimony. *Alston, supra* at 549. Nevertheless, whether the court can order an involuntary psychiatric examination of the witness to determine testimonial competency is an entirely distinct inquiry. *Id.* "The privacy implications of a compelled psychiatric examination are significant. Indeed, where the record fails to establish that there is a question as to the victim's competency, we refuse to sanction any intrusion into the victim's existing psychological records or any cross-examination as to psychiatric treatment." *Id.* The presumption of witness competency is necessary to "effectuate the fundamental policies underlying both the constitutional right to privacy and the statutory psychiatrist-patient privilege." *Henkel, supra.* Thus, a court-ordered, involuntary psychiatric or psychological examination "should never be the starting point" for a competency evaluation. *Id.; Alston, supra* at 549. Therefore, a court ought not to order an involuntary psychiatric examination of a witness unless the record unequivocally demonstrates a compelling need for the examination. *Alston, supra.* See also *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225 (1999) *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000) (affirming trial court's decision to overrule defense challenge to witness' testimonial competen-

---

child witness, once evidence of corruption is established, the court must make a searching judicial inquiry into the mental capacity of a witness under the age of fourteen; that investigation involves whether the child witness has the following: "(1) capacity to observe or perceive the occurrence with a substantial degree of accuracy; (2) ability to remember the event which was observed or perceived; (3) ability to understand questions and to communicate intelligent answers about the occurrence, and (4) consciousness of the duty to speak the truth." *Id.* at 676, 855 A.2d 27. See also *Commonwealth v. Delbridge*, 580 Pa. 68, 859 A.2d 1254 (2004) (*"Delbridge II"*) (explaining judicial competency investigations apply in cases where sexual abuse complainants are young children because child's memory is uniquely susceptible to falsely implanted suggestions which may cause child difficulty in distinguishing fact from fantasy when called to testify); *Commonwealth v. Trimble*, 419 Pa.Super. 108, 615 A.2d 48, 50 (1992). "These concerns clearly become less relevant as a witness' age increases, ultimately being rendered totally irrelevant as a matter of law by age fourteen. While the age of fourteen is somewhat arbitrary, it appears to give a sufficient buffer for slow developers such that any issue with competency at that age would need to be caused by some factor other than immaturity." *Commonwealth v. Judd*, 897 A.2d 1224, 1229 (Pa.Super.2006), *appeal denied*, 590 Pa. 675, 912 A.2d 1291 (2006). This same competency standard also applies when a proposed witness suffers from a mental condition. Pa.R.E. 601(b). "If the trial court is presented with credible evidence that a proposed witness is ... mentally retarded, the court shall conduct a judicial inquiry to determine the testimonial competency of the proposed witness. The factors ... in making [this] determination are the same factors ... used in determining the competency of a child witness." *Anderson, supra* at 1068.

cy on grounds of psychiatric instability and/or drug use, where court listened to witness testify and observed nothing to indicate impairment of witness' ability to observe, recall, or relate events relevant to case).

¶ 24 Pennsylvania case law does not expressly define "compelling need" in the context of a court-ordered, involuntary psychiatric examination of a sexual assault victim; however, other jurisdictions construe "compelling need" as follows: *State of Kansas v. Blanchette*, 35 Kan.App.2d 686, 134 P.3d 19, 31–32 (2006), *cert. denied*, 549 U.S. 1229, 127 S.Ct. 1302, 167 L.Ed.2d 115 (2007) (stating six factors to consider when deciding if there is compelling need for involuntary psychological evaluation of victim Include: "(1) whether the victim demonstrates mental instability"; (2) whether the victim demonstrates a lack of veracity; (3) whether similar charges by the victim against others are proven to be false; (4) whether the defendant's motion for a psychological evaluation of the victim appeared to be a fishing expedition; (5) whether anything unusual results following the questioning of the victim's understanding of telling the truth; and (6)"whether there are any other reasons why the victim should be evaluated"; holding where pretrial hearing provided defendant with opportunity for full cross-examination of victim and defense called psychologist to testify about general nature of trauma under such circumstances, defense failed to demonstrate compelling reason to subject victim to further psychological evaluation); *State v. Maday*, 179 Wis.2d 346, 507 N.W.2d 365, 372 (1993) (emphasis added) (stating multi-factor balancing test on rights of defendant and victim to determine whether defense established compel-

ling need for involuntary psychiatric examination of victim: "(1) the nature of the examination requested and the intrusiveness inherent in that examination"; (2) the victim's age; (3) the resulting physical and/or emotional effects of the examination of the victim; (4) the probative value of the examination to the issue before the court; (5) **the remoteness in time of the examination to the alleged criminal act;** "(6) the evidence already available for the defendant's use" and adding another "(7) based on the testimony of the defendant's named experts, whether or not a personal interview with the victim is essential before the expert can form an opinion to a reasonable degree of psychological or psychiatric certainty, that the victim's behaviors are consistent with the behaviors of other victims of sexual abuse").[7] *See, e.g., State v. Camejo*, 641 So.2d 109 (Fla.App. 1994), *decision approved by*, 660 So.2d 242 (1995) (explaining court-ordered psychological examination of victim is improper where defense has various alternative means to attack victim's veracity); *State v. Redd*, 642 A.2d 829 (Del.Super.1993) (stating allegations of discrepancies and inconsistencies in victim's testimony are fundamental matters of credibility and do not provide compelling reasons to warrant involuntary psychiatric examination of victim; "Bare allegations of fabrications will not suffice, nor will detailed allegations of fabrications if such detailed allegations do little more than attack the credibility of the victim. . . . The moving party must show 'some deviation from acceptable norms, such as an identifiable or clinical psychiatric or similar disorder, **beyond the realm of those human conditions that ordinary experience would confirm as normal'**"; such disorders are generally

---

**7.** *See State v. David J.K.,* 190 Wis.2d 726, 528 N.W.2d 434 (1994) (limiting use of multifactor test enunciated in *Maday* "to situations in which the prosecution retains experts in anticipation of trial").

characterized "by 'impairment in social or occupational functioning or symptoms **that are in excess of a normal and expected reaction'** to a stressful event"); *Gale v. State,* 792 P.2d 570 (Wyo.1990) (reiterating "it is plain error in a sexual assault case for the trial court to allow an expert witness to comment directly on the credibility or veracity of a complainant witness. Determining credibility is the sole province of the jury, and we will not allow expert witness comment or testimony on the direct effect which an alleged emotional disturbance might have on a complainant witness' ability to tell the truth at trial"; alleged emotional disturbance is insufficient reason to require victim to undergo psychological examination).

¶ 25 Under Pennsylvania law, a witness' use of alcohol and drugs historically implicated the witness' physical condition and constituted a matter of credibility for the fact finder and does not alone render witness' testimony patently unreliable. *Commonwealth v. Hudson,* 489 Pa. 620, 414 A.2d 1381 (1980) (holding witness' ability to testify about events he witnessed after consuming beer and marijuana is matter of credibility for jury to consider). *See also Commonwealth v. Marker,* 231 Pa.Super. 471, 331 A.2d 883 (1974) (stating witness is not incompetent to testify merely because he is drug addict; drug use goes to credibility); *Commonwealth v. Reginelli,* 208 Pa.Super. 344, 222 A.2d 605 (1966) (stating fact that witness was taking drugs at time he overheard damaging statements made by defendants did not render witness incompetent, and weight to be given his testimony was for trier of fact).

¶ 26 In fact, this Court more recently held that a prior history of drug use as detailed in medical records is not even relevant to consent in a rape case:

Relevant evidence that is offered to prove defects in a witness' ability to perceive or recollect accurately may be introduced for impeachment purposes. Certainly, evidence that the victim ingested drugs on the evening in question, prior to the alleged attack, would be relevant to a determination of whether the victim's recall was accurate. [The defendant] could pursue a line of questioning relative to the victim's state of mind during the time immediately surrounding the alleged attack.

Any other questioning concerning a general history of drug abuse would be collateral to the matter at hand and only serve to sully the reputation of the victim in the eyes of the jury.

*Commonwealth v. Guy,* 454 Pa.Super. 582, 686 A.2d 397, 403 (1997), *appeal denied,* 548 Pa. 645, 695 A.2d 784 (1997).

¶ 27 The use of antidepressant drugs at or after an event likewise implicates the credibility not the testimonial competency of a witness. *Henkel, supra* at 441. In *Henkel,* the defendants were convicted of various crimes in connection with the abduction of two victims, which ultimately resulted in one victim's death. Following their convictions, the court sentenced each defendant to life imprisonment. On appeal, the appellants challenged, *inter alia,* the trial court's denial of their pre-trial motion to compel a psychiatric examination of the Commonwealth's chief witness. In their motion, the appellants had argued the witness was incompetent to testify, because the witness was potentially suffering from depression and was currently taking anti-depressant medication. Defense counsel claimed such medication "enhanced" the witness' memory. The appellants also suggested the fact that the witness had been hospitalized in a mental institution three months prior to trial supported this contention. The trial court denied the appellants' motion to compel the psychiatric examination, reasoning

their arguments actually spoke to the witness' credibility, not to his competency. In response to the appellants' arguments, this Court analyzed the relevant law and reasoned as follows:

[T]he trial transcripts [must give] an unequivocal indication [the witness] was incompetent. They do not.

In addition, appellants' attempt to equate depression with Alzheimer's disease is preposterous and troubling. Were we to sanction court-ordered psychiatric examinations every time a question is raised as to a witness' mental health treatment based on such flawed analogies, we would not only open the door to unwanted invasions of privacy but we would also give witnesses reason to refuse or resist testifying anytime they previously had sought treatment for garden variety mental health issues. Furthermore, while we recognize testimony at the evidentiary hearing suggested [the witness] was indeed hospitalized for mental health problems three months prior to the murder trial, [appellant] does not point to any evidence tending to show this hospitalization impaired [the witness'] ability to perceive the events leading up to [the victim's] murder, interfered with his ability to recall these events, rendered him unable to communicate what he perceived, or destroyed his ability to appreciate the import of giving testimony. [Appellant's] argument makes it clear he is attacking [the witness'] credibility—not his cognitive ability.

*Id.* at 441. This Court also held the witness' psychiatric records were irrelevant and collateral to the case and would simply result in a "witchhunt." *Id.* at 442. As such, this Court affirmed the trial court's decision to deny the appellants' motion to compel a psychiatric examination of the Commonwealth's chief witness. *See also*

*Commonwealth v. Dolhancryk,* 273 Pa.Super. 217, 417 A.2d 246 (1979) (affirming trial court's denial of defense request for psychiatric evaluation of witness where allegations of witness' ability to testify truthfully related to credibility, not testimonial competency).

¶ 28 In the instant case, Appellee's motion and supplemental motion to compel C.U. to submit to an involuntary psychiatric and/or psychological evaluation repeatedly referred to her failure to recall certain facts about the alleged incident, emphasizing that C.U.'s "mental instability" at the time of the incident was admissible to impeach her credibility. Appellee further averred C.U.'s admitted intoxication, use of narcotic drugs, inability to "remember material facts" and her "mental instability" affected her credibility. (*See* Appellee's Supplemental Reasons, filed 10/3/06, at 1). In an effort to transform his attack on C.U.'s credibility into an issue of testimonial incompetency, essentially Appellee suggested her credibility failed as a matter of law such that it rendered C.U. legally incompetent to testify. Albeit an aggressive defense, Appellee's motions were bare allegations, which as presented did nothing more than attack C.U.'s credibility. Therefore, we conclude the motions alone did not make out a compelling need for a court-ordered involuntary psychiatric and/or psychological evaluation of C.U.

¶ 29 During the pre-trial hearing on Appellee's motion, the defense expert Dr. Fischbein was called upon to simply speculate on the value of a compelled psychiatric and/or psychological evaluation of C.U. A careful review of his testimony makes clear, Dr. Fischbein, over the Commonwealth's objection, said he would want to perform a psychiatric interview of C.U. to find out why C.U. was on a prescription medication for stomach problems, when

that medication is typically used to treat depression or an anxiety disorder. Dr. Fischbein said without an examination, he could not tell why C.U. failed to remember all the details of the incident of October 5, 2005, that an examination "would be helpful" in figuring out why C.U. had difficulty remembering the event. He also opined that the prescription medications C.U. admitted taking were not compatible with alcohol intake. In other words, he would have recommended a person on her medications to limit drinking alcoholic beverages. Dr. Fischbein also stated he "suspected" C.U. was also being treated for depression rather than just stomach problems, because the medication she took on the morning of October 5, 2005 was a "commitment" drug not usually prescribed for short term disorders. Dr. Fischbein wanted to know why the medications were prescribed. Coupled with significant other testing, Dr. Fischbein wanted to discover if C.U. had any "personality issues" consistent with post-traumatic stress disorder.

¶ 30 Importantly, on cross-examination, Dr. Fischbein conceded that C.U. had remembered many details about the incident. He also agreed the details C.U. failed to remember were minor things, such as whether the beer she drank was draft or in a bottle. Although Dr. Fischbein insisted the issue for him was more than just intoxication, he also conceded the real question was not necessarily why the prescription drugs were prescribed but the interaction and effects of the drugs and alcohol. Dr. Fischbein also admitted that after an evaluation, he might still not have an explanation for why C.U.'s memory of the incident was somewhat impaired. (*See* N.T. Pretrial Hearing, 12/12/06, at 27–73). Nowhere in his testimony did Dr. Fischbein suggest that C.U.'s "memory gaps" were directly related to a mental condition in excess of a normal and expected reaction to a stressful event.

¶ 31 Significantly, C.U. was also present at the hearing. Nevertheless, she was only called to testify regarding (1) whether she had generated any emails about the incident, which she denied; and (2) whether she had ever been treated as an outpatient or inpatient at any psychiatric facility, which she also denied. (*Id.* at 75–76; R.R. Vol. II at 77a–78a). Neither the court nor defense counsel took the opportunity to ask C.U. any other questions, although she was available for inquiry. Instead, without hearing from the witness, the court granted Appellee's request for an involuntary psychiatric and/or psychological evaluation of C.U., because the court wanted to "evaluate the physical/psychiatric affects and effects of ingestion of these substances by the alleged victim." We respectfully disagree with the court's reasoning on this issue, as we conclude any questions the court might have about the interplay of the drugs and alcohol are better served by a forensic toxicology report. The court's reservations, however, simply do not amount to a compelling need for an involuntary psychiatric and/or psychological evaluation of C.U.

¶ 32 Likewise, the curiosity of Appellee's expert is not dispositive of C.U.'s competency to testify. Any attempt to "dig up" potential past emotional disturbances through an intrusive psychiatric evaluation, where the record does not indicate that C.U. suffers from a diagnosed mental condition, is contrary to the purpose of court-ordered psychiatric examinations and will likely only further embarrass and harass the victim. As such, we cannot agree with Appellee's contention that an inquiry into **why** C.U.'s doctor prescribed certain medications is necessary under these circumstances. Appellee could very easily pursue a line of questioning on cross-examination at trial relative to C.U.'s state of mind during the time immediately

surrounding the alleged attack. *See Guy, supra.*

¶ 33 Additionally, C.U. was twenty-four (24) years old when she testified at the preliminary hearing. Nothing in the record indicates C.U. suffers from a mental condition. Moreover, we cannot agree with Appellee's contention that there were seventy-one "material" gaps in C.U.'s preliminary hearing testimony, which would present a compelling need for an involuntary psychiatric and/or psychological evaluation. After a thorough review of the relevant transcript, we observe defense counsel repeatedly invited C.U. to say "I don't know" if she could not recall a detail. Further, many of C.U.'s "I don't know" answers were in response to the same questions asked multiple times and related to minor details of the evening that might not even be relevant at trial, such as whether the beer she drank came in a glass or a bottle, whether she conversed at length with Appellee and what they said throughout the entire evening, whether Appellee's passenger side car door was locked or unlocked when C.U. first opened it, whether she put on her seat belt when she entered Appellee's vehicle, whether Appellee was wearing his seat belt, whether Appellee said anything to C.U. when he grabbed her hair and pushed her head onto his penis, whether Appellee said anything to C.U. when Appellee grabbed her body and forced C.U. on the hood of the car, whether Appellee said anything to C.U. when she heard her phone ring, whether her purse was unzipped or zipped when she went to get her phone, or whether Appellee said anything more to C.U. after he told her to get out of his car. In short, the mere number of times C.U. said "I don't know" or "I don't remember" does not merit an involuntary psychiatric and/or psychological evaluation.

¶ 34 In light of long-standing Pennsylvania public policy strongly disfavoring involuntary psychiatric examinations absent a compelling need, we conclude the record in this case does not support the court's order granting Appellee's request. *See Alston, supra.* We simply cannot agree that Appellee met his burden by clear and convincing evidence. Thus, we hold the trial court misapplied the law when it ordered an involuntary psychiatric examination of C.U., absent a compelling need. *See Hunt, supra.*

¶ 35 Based upon the foregoing, we hold the court erred when it ordered an involuntary psychiatric examination of C.U. on the grounds alleged. Accordingly, we reverse and remand for further proceedings.

¶ 36 Order reversed; case remanded for further proceedings. Jurisdiction is relinquished.

¶ 37 JUDGE KLEIN FILES A DISSENTING OPINION.

DISSENTING OPINION BY KLEIN, J.:

¶ 1 The majority claims that the experienced trial judge, the Honorable Peter Paul Olszewski, Jr., abused his discretion when he believed based on uncontradicted medical testimony that neither the doctor nor he had sufficient information to ascertain whether or not the alleged victim in this case, C.U., was competent to testify. I disagree, and do not believe he abused his discretion by finding that he had a compelling need to order a psychiatric evaluation to make this determination. When the expert concluded that there was a good chance that C.U. was unable to perceive, remember and recount what happened and could not make that determination without an examination, it is understandable that the trial judge would agree and find this one of those rare occasions

when a psychiatric examination should be ordered.

¶ 2 It is clear that Judge Olszewski knew the restrictions on the right of a trial judge to order a psychiatric evaluation of a complaining witness in a sexual abuse case, and understood that the defense must establish a compelling reason for the evaluation. Judge Olszewski said on page 9 of his 1925(a) opinion:

Initially, we make the following observation. For fifteen (15) years the undersigned has served both as a prosecutor and member of the bench. From this perspective I have acquired considerable experience in the criminal justice system. A defense request for an involuntary psychiatric examination of an alleged victim of sexual assault is infrequent, if not rare. A court's grant of such request is extraordinary. The record in the instant matter suggests this is an extraordinary case, as the Defense has demonstrated a compelling need for the examination.

¶ 3 The question of a person's competency to be a witness is vested in the sound discretion of the trial court. *Commonwealth v. D.J.A.*, 800 A.2d 965 (Pa.Super.2002) (*en banc*). Furthermore, "the mental competency of every witness is presumed [ . . . ]." *Commonwealth v. Ware*, 459 Pa. 334, 352, 329 A.2d 258, 267 (1974). Lastly, incompetency does not follow from the fact that the witness is insane or mentally ill. *Id.* at 352, 329 A.2d at 267. As a result, a trial court does not have an obligation to order an investigation of a witness' competency unless the trial court has some doubt on the issue from having observed the witness. *See Commonwealth v. Jennings*, 446 Pa. 294, 304, 285 A.2d 143, 149 (1971); *see also Commonwealth v. Smith*, 414 Pa.Super. 208, 606 A.2d 939, 943 (1992). Here, based on the evidence presented to him, Judge Olszewski had

some doubt. The expert said that the drugs taken could well have an effect on the ability of C.U. to perceive, remember and relate what happened and there may have been some underlying medical and psychological conditions that could have an effect. This medical judgment was supported by the fact that the witness was unable to remember many of the details of the event. If the medical expert has serious questions as to competence, and the judge had no other means to make that determination, acquiescing in the expert's opinion that a psychiatric evaluation was necessary to possibly shed some light on the situation is not an abuse of discretion.

¶ 4 When a trial court addresses the competency of a witness to testify, it must determine if the witness has the ability to: (1) perceive an event with a substantial degree of accuracy; (2) remember it; (3) communicate about it intelligibly; and (4) be mindful of the duty to tell the truth under oath. *Commonwealth v. Goldblum*, 498 Pa. 455, 465, 447 A.2d 234, 239 (1982). The core of the competency test is the ability to give a correct account of the matters that the witness has seen or heard. *Ware*, 459 Pa. at 353, 329 A.2d at 268. Stated otherwise,

A competency hearing concerns itself with the minimal capacity of the witness to communicate, to observe an event and understand the necessity to speak the truth. A competency hearing is not concerned with credibility. Credibility involves an assessment of whether or not what the witness says is true; that is a question for the fact finder. An allegation that the witness's memory of the event has been tainted raises a red flag regarding competency, not credibility. Where it can be demonstrated that a witness's memory has been affected so that their recall of events may not be dependable, Pennsylvania law charges

the trial court with the responsibility to investigate the legitimacy of such an allegation.

*Commonwealth v. Delbridge,* 578 Pa. 641, 855 A.2d 27, 40 (2003) (*"Delbridge I"*) (citations omitted).

¶ 5 Appellee filed an omnibus pre-trial motion requesting a psychiatric examination of C.U. on grounds that she was not competent to testify because her mental capacity to observe and remember the occurrences were substantially impaired by the ingestion of alcohol and/or prescribed drugs. Essentially, the claim was that because of a combination of mental problems, and drug and alcohol consumption, C.U. was unable to perceive what had happened and therefore to recollect and recount it.

¶ 6 The defense called an expert witness. Dr. Fischbein, to discuss C.U.'s competency and to explain why he believed there was a need for a psychiatric examination to make that determination. C.U. testified that she had taken the prescription drugs Ortho–Tricyclen, Protonix, Zelnorm, and Lexapro. Dr. Fishbein labeled Lexapro as an anti-depressant. He also indicated that C.U. reportedly took Darvocet, which he labeled as a painkiller.

¶ 7 Judge Olszewski evaluated the testimony as follows:

While none of the factors relied upon by [Appellee], in isolation, establish a compelling need for an examination; considered together one is clearly warranted. This Court simply lacks sufficient expertise to understand and evaluate the physical/psychiatric affects and effects of ingestion of these substances by the alleged victim. This evaluation and determination becomes more difficult given the alleged victim's acknowledged alcohol consumption. Dr. Fischbein's testimony establishes the ingestion of a combination of these constituent substances implicates a person's ability to perceive and recall. We cannot make a factual determination on the ultimate issue of testimonial competency unless we understand and appreciate the drugs' interaction and the extent to which they effected [*sic*] the ability to accurately recall, [*sic*] perceive and articulate the relevant sequence of events.

The record before us sufficiently demonstrates the alleged victim's inability to remember or recall relevant information at or near the time of the alleged assault. Indeed, the excerpts [from the preliminary hearing] referenced in [Appellee's] Exhibit 1 indicate her inability to recall information and events immediately prior to, during and shortly after the alleged sexual assault. The preliminary hearing testimony coupled with Dr. Fischbein's testimony implicate the alleged victim's testimonial competency. It is beyond argument, indeed the Commonwealth does not suggest otherwise, that the pharmacological combination of substance[s] referenced in this record produce impairment—the central consideration is to what extent.

The issue of the alleged victim's testimonial competency has been sufficiently raised and the [October 5, 2006] hearing has indeed revealed the existence of a valid competency concern. Expert testimony would greatly assist this Court in assessing the question of competency. This examination, narrowly tailored and focused on the specific issues outlined by Dr. Fischbein, in the presence of an Assistant District Attorney, a police prosecutor and a close relative, if desired by the alleged victim, is warranted.

Trial court opinion, 12/13/06, at 10–11 (footnote omitted).

¶ 8 In the present matter, we have more than the bare assertions of Appellee con-

cerning C.U.'s failure to answer questions to suggest that she could not describe accurately the events relating to the sexual assault. We have a record of significant ingestion of both drugs and alcohol, which well could affect the ability to perceive. In addition, we have a transcript of the preliminary hearing documenting C.U.'s responses to the defense's inquiry into her recollection of events attendant to the charges filed. *Contrast Commonwealth v. Counterman*, 553 Pa. 370, 393, 719 A.2d 284, 295 (1998) ("Counterman's bare assertions concerning Mrs. Counterman's intelligence and her slowness in responding to questions did not suggest that she could not accurately describe [*sic*] the events leading up to the fire. Consequently, the trial court properly exercised its discretion in denying Counterman's request for a competency examination of his wife.").

¶ 9 At the preliminary hearing, C.U. gave an account surrounding the alleged sexual assault, which reflects upon her competency to recall the events surrounding the case. It is true that in and of itself, forgetting some details would not be sufficient to justify a court-ordered psychiatric examination. However, this is combined with the drug and alcohol ingestion, which is why the expert said he needed a psychiatric examination before reaching an opinion on competency.

¶ 10 There were a number of matters that C.U. stated she either did not remember or did not recall related to what happened on the evening of October 13th and the early morning hours of October 14th. For example:

[Appellee's counsel:]

Q. During the course of that evening, was there any sexual talk between you and [Appellee] when you were at the bar?

[Complainant:]

A. Again, I can't remember what our conversation was.

Q. I'm not asking you to remember every piece of your conversation—

A. Right.

Q. —but you're claiming you were raped. Now, in the course of that night in that bar, are you telling me you can't remember if there was any conversation related to any sexual overtones?

A. I honestly cannot remember our conversation at the time.

Q. Relating to anything sexual?

A. Relating to anything.

Q. Sexual?

A. Anything.

Q. Anything?

A. Yes.

Q. Okay. So other than you saying hello to [Appellee] that night in the bar, you can't remember anything further in terms of your conversation with him?

A. No, I cannot. Inside the bar.

Q. Inside the bar we're talking about?

A. Correct.

\* \* \* \*

Q. And did you have any conversation with him up to his pants being unbuttoned?

A. I can't recall any.

Q. You can't recall anything?

A. I can't remember anything that was said, anything that he had said.

Q. And all of a sudden, the next thing you see is his pants were unbuttoned?

A. I saw them unbuttoned.

Q. At that point in time, up to that point in time, you don't remember him threatening you in anyway?

A. I can't remember anything. I mean I don't, I can't remember.

\* \* \* \*

Q. So, you see his zipper down and you see his penis out; is that correct?

A. Yes.

Q. And when you see this; what, if anything, did you say to him?

A. Again, I can't remember words exchanged.

Q. You can't remember anything that was said?

A. No.

Q. You don't remember anything he even said to you either?

A. No.

N.T. Preliminary Hearing, 12/12/05, at 48–50, 85–86.

¶ 11 Furthermore, C.U. did not remember whether she drank draft or bottled beer at Murray's Bar or how she got out of Appellee's vehicle after performing oral sex, nor could she state where on her body Appellee picked her up to place her on the hood of his vehicle to have sex. *Id.* at 92–93, 96. Yet, she did admit drinking enough beer and whiskey to be "intoxicated," did recall taking prescription drugs, did kiss Appellee "passionately" in his vehicle, and claims he did perform oral sex and sexual intercourse against her will. *Id.* at 54, 60–61, 74, 90, 100. C.U. attempted to minimize her memory loss by attributing it to the trauma of having been sexually assaulted by Appellee. *Id.* at 49–50.

¶ 12 Dr. Fischbein, on the other hand, opined such selective memory loss was sufficient to warrant a psychiatric examination to analyze the root-cause for such an episodic event, especially given the negative impact (memory loss and/or blackouts) anti-depressant drugs could have upon a person when ingested in tandem with alcohol. N.T. Competency Hearing, 10/5/06, at 39–40. Toward that end, Dr. Fischbein stated that knowledge of the dosage C.U. was taking and why she was being given these drugs were imperative *to diagnose their influence on her competency to recall events post-ingestion.* N.T. Competency Hearing, 10/5/06, at 7. Thus, proffered Dr. Fischbein, there was a need for a psychiatric examination to assess C.U.'s competency, which was predicated upon the expert's review of the complaint; the affidavit of probable cause attached to the police criminal complaint; Wilkes–Barre police department offense report; Wilkes–Barre police department supplemental reports; Pennsylvania State Police serology report; Wyoming Valley Healthcare emergency room records; interview of C.U.; interview of six witnesses; preliminary hearing transcript; and Appellee's omnibus pre-trial motion. *Id.* at 29.

¶ 13 Despite the expert's possession of the aforementioned data, he still was of the opinion that a psychiatric examination of C.U. was necessary; to-wit:

[Assistant District Attorney:]

Q. And with that knowledge [—evidence in the transcript—], you're still telling this Court that you feel there is a substantial need for [*sic* ] to you conduct this psychiatric examination on [C.U.]?

[Dr. Fischbein:]

A. Yes, because that would not negate other explanations for why she can't remember. It could be as simple as alcohol intoxication. It could be that, periodically, under severe stress, she may have a dissociative state where she goes blank, for a better term, a circuit breaker goes off; that can happen in certain personality makeups, or perhaps after what she perceived happen [*sic* ] in

the car, she had a severe reaction and had a posttraumatic stress disorder and then blanked for that period of time.

So, there's many, many explanations. If she didn't take any Darvocet, it doesn't negate any of the other possibilities. It's just possibility.

Q. I believe that your testimony with regard to the need for this type of psychiatric examination is that the more history you can have, the more helpful it is to maximize your chance of being able to come to a conclusion on this issue; is that correct?

A. On the issue of why she can't remember certain events of that evening, yes, that's true.

\* \* \* \*

Q. Doctor, do you feel in your professional opinion that there is no other way to go about finding out a cause for the blanks in [C.U.'s] memory other than forcing her to undergo an involuntary psychiatric exam?

A. Based on what I know, no, I can't. I can't.

NT. Competency Hearing, 10/5/06, at 56–57, 61.

¶ 14 When viewed as a whole, the events (documented selective memory loss) associated with the consumption of alcohol and prescription drugs coalesce to present a compelling reason to warrant a psychiatric examination. **See** N.T. Competency Hearing, 10/5/06, at 39–40 (Dr. Fischbein: "alcohol in large quantity, depending on how much was had, can cause an alcohol blackout or trouble remembering events while you're intoxicated. Mixing Darvocet with alcohol ... can cause sedation.... You then add Lexapro to the picture ... alco-

hol is depressogenic. It can make your depression worse or your anxiety.... Lexapro with alcohol can increase the intoxication."). As the Pennsylvania Supreme Court said in *Commonwealth v. Delbridge (Delbridge)*, 578 Pa. 641, 668, 855 A.2d 27, 43 (2003):

> In a competency hearing, the trial judge must determine the facts and reach a legal conclusion. It is thus the trial judge who must decide if expert testimony will advance a resolution of the question of competency on a case-by-case basis. Accordingly, we will leave it to each individual jurist, subject to appropriate review, the decision of whether in any particular case ... expert testimony would assist the court in understanding the evidence or determining a fact in issue during a competency hearing."
> (Citation omitted)

¶ 15 I do not believe Judge Olszewski abused his discretion when he concluded:

> The issue of the alleged victim's testimonial competency has been sufficiently raised and the hearing has indeed revealed the existence of a valid competency concern. Expert testimony would greatly assist this Court in assessing the question of competency.

Trial Court Opinion, 12/13/06, at 11. To reverse this decision is not just taking over the role of the trial judge in initially making this determination, but also is taking over the role of the physician by discounting his *uncontradicted* medical testimony.

¶ 16 Based on the above, I believe that the trial court did not abuse its discretion in crediting the expert witness when the expert said he could not make a determination as to competency without a psychiatric examination of C.U. under the particular facts of this case.[1] As Judge

---

1. We note that the trial court directed that after the completion of the psychiatric exami-

nation, the preparation of the expert's written findings and opinion are to be submitted for

Olszewski said, "This Court simply lacks sufficient expertise to understand and evaluate the physical/psychiatric affects and effects of ingestion of these substances by the alleged victim." *Id.* at 10. I believe that we also lack the expertise to make medical judgments, and should not fault the trial judge for asking for further help in making this medical decision.

¶ 17 Accordingly, I would affirm and am compelled to dissent.

its review within a timely fashion. After considering the findings of fact and opinion of the defense's expert, the trial court must then determine whether Appellee's burden to overcome the presumption of competency has been established by clear and convincing evidence. *Commonwealth v. Delbridge*, 580 Pa. 68, 73, 859 A.2d 1254, 1257–58 (2004) ("*Delbridge II*"). If Appellee fails to meet his burden of proof that C.U. is not competent to testify by clear and convincing evidence, the trial court must find that she is competent to testify at trial about the events attendant to the charges filed. *Delbridge II*, at 73, 859 A.2d at 1257.